UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 07-80824-CIV-MARRA/JOHNSON

EXHIBIT ICONS, LLC et al,

Plaintiffs,

vs.

XP COMPANIES, LLC, et al,

Defendants.

_____/

**OPINION AND ORDER**

      This cause is before the Court upon Defendant XP Companies, LLC, XP Entertainment,

LLC and William Wall III's Motion to Dismiss the Amended Complaint or, in the Alternative,

Transfer of Venue (DE 19); Plaintiffs Exhibit Icons and Russell Etling Company's Motion for

Leave to File a Brief Surreply to Defendants' Reply Memorandum (DE 88); Plaintiffs Exhibit

Icons and Russell Etling Company's Request for Oral Argument on Defendants' Motion to

Dismiss for Lack of Jurisdiction (DE 92); Defendant XP Companies, LLC, XP Entertainment,

LLC and William Wall III's Motion to Dismiss Second Amended Complaint for Lack of

Personal Jurisdiction, or, in the Alternative, Change of Venue (DE 99); Plaintiffs Exhibit Icons

and Russell Etling Company's Request for Oral Argument on Defendants' XP Companies, LLC,

XP Entertainment, LLC and William Wall III's Motion to Dismiss Verified Second Amended

Complaint (DE 112); Defendant XP Apparel, LLC's Motion, and Joinder in the Defendants'

Motion, to Dismiss Second Amended Complaint for Lack of Personal Jurisdiction or, in the

Alternative, Change of Venue (DE 115); Plaintiffs Exhibit Icons and Russell Etling Company's

Request for a Hearing on Defendant XP Apparel, LLC's Motion to Dismiss for Lack of

Jurisdiction (DE 119); Plaintiffs Exhibit Icons and Russell Etling Company's Motion to Strike

Affirmative Defenses and Portions of Defendants' Answer (DE 126) and Plaintiffs Exhibit Icons

and Russell Etling Company's Motion to Strike Affirmative Defenses and Portions of

Defendants' Answer (DE 132).

<u>*MOTIONS RELATING TO PERSONAL JURISDICTION*</u>

I.  Background

According to the Second Amended Complaint ("SAC"), Plaintiff Exhibit Icons ("EI") is a

Florida limited liability company and Plaintiff Russell Etling Company ("Etling") is a Florida

corporation. (SAC ¶¶ 2-3.)  Defendants XP Companies, LLC ("XP Companies"),  XP

Entertainment, LLC ("XP Entertainment") and XP Apparel, LLC ("XP Apparel") are Colorado

limited liability companies.  Defendant William Wall resides in Colorado.  (SAC ¶¶ 4-7.)   The

eight-count SAC alleges: (1) breach of contract against XP Companies, XP Entertainment and

Wall (count one); (2) breach of the duty of good faith and fair dealing against XP Companies, XP

Entertainment and Wall (count two); (3) declaratory relief against XP Companies, XP

Entertainment and Wall (count three); (4) money owed against XP Companies, XP Entertainment

and Wall (count four); (5) intended third-party beneficiary breach of contract against XP

Companies, XP Entertainment and Wall (count five); (6) fraud in the inducement against XP

Apparel and Wall (count six); (7) negligent misrepresentation in the inducement against XP

Apparel and Wall (count seven) and (8) promissory estoppel against XP Apparel (count eight).

In 2003, Etling entered into a long-term licensing agreement to produce a traveling

exhibition of the Napoleon Collection, a collection of personal items and memorabilia associated

with Napolean Bonaparte. (SAC ¶¶ 12-13.)  Etling's responsibilities included providing

supporting work to the Collection, including design, development and marketing work to be performed in Florida. (SAC ¶ 14.)  In March of 2006, Etling and EI entered into an agreement in Florida whereby EI was hired as Etling's agent to promote and arrange the tour of the Collection. (SAC ¶ 17.)

Thereafter, EI entered into an agreement with XP Companies for XP Companies to be the exclusive tour operator of the Napoleon Tour, beginning June 1, 2007 and ending April 30, 2012. During the first year of the agreement, XP Companies was to pay EI one million dollars.  XP Companies was referred to in the agreement as XP Exhibits and Mr. Wall signed the agreement on behalf of XP Exhibits.  (Sept. 8, 2006 Contract, attached to DE 1.)   Plaintiffs allege that Defendants XP Companies, XP Entertainment and Mr. Wall breached their contractual obligations as Napoleon tour operator and failed to pay amounts due under the contract. (SAC ¶ ¶ 50-73.)  In addition, Plaintiffs allege that XP Apparel and Mr. Wall represented to Plaintiffs that XP Apparel and the other corporate defendants were one and the same entity in order to induce them to enter into the aforementioned contract. (SAC ¶ ¶ 84-97.)

Defendants XP Companies, XP Entertainment and Wall moved to dismiss the first amended complaint for lack of personal jurisdiction on December 4, 2007 (DE 19).  On March 3, 2008, the Court granted Plaintiffs' motion for leave to take jurisdictional discovery and permitted the parties to file amended responses/replies to Defendants' motion to dismiss (DE 40). Defendants XP Companies, XP Entertainment, Wall and XP Apparel now argue that Plaintiffs cannot establish either specific or general  jurisdiction over them.

The Court will examine the evidence garnered by the parties with respect to the motion to dismiss for lack of personal jurisdiction.

3

*Specific Jurisdiction Evidence*

      In early 2006, Gary Stern, the president of EI, had a business discussion with Zvi Harpaz, the operator of a marketing and placement services in Boca Raton, Florida, about the Napoleon Collection. (Harpaz Aff. ¶ 2; Stern Aff. ¶ 2, attached to DE 30 and 31.)  Mr. Harpaz then discussed the Napoleon Collection with Jeremy Fey, who worked for XP Apparel, and Jeremy Fey told Mr. Harpaz that he thought his company would be interested in obtaining the touring rights and that he would discuss it with Mr. Wall, the president of "XP."[1]  Subsequently, Jeremy Fey telephoned Mr. Harpaz and said that "they had a strong interest" in obtaining the touring rights and a contract was signed by Mr. Wall on behalf of XP Apparel to secure Mr. Harpaz's commission.  Jeremy Fey instructed Mr. Harpaz to have Mr. Stern call Mr. Wall. (Harpaz Aff. ¶ ¶ 4-8; Stern Aff. ¶ 3.)

      Mr. Stern then called Mr. Wall and was told to call Jeremy Fey who was his "point man" with respect to the Napoleon Collection. (Stern Aff. ¶ 4.)  When Mr. Stern called Jeremy Fey, he stated that Mr. Wall and XP were very interested in purchasing the rights to market the Napoleon Collection.  On April 12, 2006, Jeremy Fey emailed Mr. Stern that Mr. Wall wanted Mr. Stern to make the offer. (Stern Aff. ¶ 5.)

      Mr. Stern and Jeremy Fey had "hundreds of follow-up telephone conversations" and communicated nearly every day by telephone, email and facsimile regarding the terms for "defendants"[2] to obtain the tour rights to the Napoleon Collection.  Jeremy Fey called Mr. Stern

---

[1] The Stern affidavit does not identify to which company "XP" refers.

[2] The Court assumes "defendants" include XP Companies, XP Entertainment and Mr. Wall. At the time this affidavit was created, XP Apparel was not a defendant in the case.

4

in Florida at least 188 times from April 13, 2006 through June 28, 2006.  (Stern Aff. ¶ 6.)
During all of the telephone calls with Jeremy Fey, Jeremy Fey stated that "defendants" had a
keen interest in obtaining the tour rights to the Napoleon Collection.  (Stern Aff. ¶ 7.)   In
addition, Jeremy Fey spoke to Mr. Stern about his famous father, promoter Barry Fey, "who has a
world-wide reputation for working with such groups as The Who, the Rolling Stones," and
emphasized that Barry Fey was a resource that could be used in marketing the exhibit. (SAC ¶ ¶
24, 27.)

In late March or early April of 2006, Mr. Stern received a draft contract from Jeremy Fey,
sent to him in Florida via email.  In June and August of 2006, Mr. Stern met with Jeremy Fey and
Mr. Wall in Colorado and then again with Jeremy Fey in Georgia. Final contract terms were
agreed to in principle. (Stern Aff. ¶ 7.)

In September of 2006, EI entered into the contract with XP Companies, LLC, which was
referred to in the contract as "XP Exhibits" and "XP Sports and Entertainment."  The contract
provided that XP Companies would pay EI $75,000.00.  (September 8, 2006 Contract, DE 1.)
According to the SAC, XP Apparel and Wall induced EI to enter into the contract with these
entities by representing these entities as divisions of a large conglomerate that were legally one
and the same. (SAC ¶ 1.)   XP Apparel and Wall sought to shift liability to XP Companies, LLC,
a non-operational and defunct entity, in order to shield XP Apparel from liability under the
contract. (SAC ¶ ¶ 2, 75.)

In March 2007, Mr. Stern met with Jeremy Fey and Mr. Wall in Denver.  They had
decided to pursue promotion of the Napoleon Collection in exhibit space rented in Florida.  Mr.
Stern was asked to suggest sites and Plaintiffs then explored sites in Miami, Fort Lauderdale and

West Palm Beach.  On March 20, 2007, Jeremy Fey sent Russell Etling, Etling's President, an email with a budget and numerous questions about the Miami venue.  (Stern Aff. ¶ 11.)  Jeremy Fey told Mr. Stern that "defendants" would lease three storefronts in West Palm Beach and sent him a copy of an email he sent to a representative of CityPlace in West Palm Beach. Jeremy Fey also sent Plaintiffs a schedule which contemplated him living in Florida for at least 30 consecutive weeks while he was managing the exhibit.  (Stern Aff. ¶ 12.)  Jeremy Fey also told Mr. Stern that Mr. Wall was his "best friend" and that Mr. Wall would be traveling to Florida to confer about this transaction.(Stern Aff. ¶ 13.)

William Wall, the president of XP Companies and XP Entertainment, states that neither XP Companies nor XP Entertainment have any offices, real property or bank accounts in the state of Florida. No representative of XP Companies or XP Entertainment has traveled to Florida for any business dealings with EI.  Mr. Wall first met Mr. Stern in Colorado and the Agreement between EI and XP Companies was signed there. (DE 8-2.)  Jeremy Fey first met Mr. Stern and Mr. Etling in South Carolina to view the Napoleon exhibit.  Jeremy Fey next met Mr. Stern in Georgia at a USA volleyball event where XP Companies was present for the purpose of apparel sales. Mr. Stern traveled there to see how XP Companies conducted its events.  Jeremy Fey never traveled to Florida to meet with Plaintiff or Plaintiffs' representatives. Nor have any other XP Companies representatives traveled to Florida to meet with Plaintiffs. Jeremy Fey's communications with Plaintiffs were by telephone and email.  According to Jeremy Fey, XP Companies did not solicit or approach Plaintiffs to enter into any agreement to exhibit or display the Napoleon exhibit (DE 8-3.)  Mr. Wall has never been to Florida on business. (Wall Dep. 153.)

*General Jurisdiction Evidence*

XP Entertainment, LLC, which uses the trade name "XP Events" manages facilities and events for clients in Jacksonville and Sunrise, Florida as well as locations in North Carolina and Arizona. (Ex. 21 to Wall Dep. Alan Fey Dep. 7-8.)   In 2006, XP Events entered into a ten-year contract with the Jacksonville Jaguars after the Jaguars sent them a "request for proposal" to manage the day-to-day game operations for retail sales at their venue on ten game days. (A. Fey Dep. 9-13, 99.)  The Jaguars pay XP Events a management fee with the potential for more revenue, depending on the performance of the season (A. Fey Dep. 17, 55.)   There are 30 to 50 employees who are hired by XP Events. (A. Fey Dep. 13, 15.)

XP Events does not lease any space in the Jaguar stadium. (A. Fey Dep. 16, 100.)  XP Events' buyer in Arizona places the merchandise order for the Jaguars, which is billed and sent to the Jaguars directly. (A. Fey Dep. 15-17.)  XP Events helps in the purchasing of merchandise, but does not own the merchandise. (A. Fey Dep. 13.)   The merchandise is approved and paid for by the Jaguars. (A. Fey Dep. 16.)  XP Events has an office at the stadium where one person works. (A. Fey Dep. 16.)   Alan Fey, the president of XP Entertainment, has visited Jacksonville once in connection with its business with the Jaguars. (A. Fey Dep. 4, 47-48.)

Jennifer Simmons is the director of merchandising for the Florida Panthers. (Simmons Dep. 3.)  In 2006, she received an information packet from XP Events. (Simmons Dep. 6.)  After an initial meeting with Alan Fey in 2006, the parties continued with negotiations in 2007.  (A. Fey Dep. 22-23; Simmons Dep. 7-8.)   Even before a contract had been entered into, the Panthers and XP Events agreed that XP Events would order merchandise for the Panthers, which XP Events did. (A. Fey 51-53; Simmons Dep. 9.)  During the course of negotiation, Alan Fey came

to Florida two or three times. (Simmons Dep. 17.)  A contract was eventually signed in late June

of 2007 to begin operations in October of 2007. (A. Fey Dep. 24.)  After the contract was signed,

Alan Fey came to Florida three or four times. (A. Fey Dep. 48.)

The first game for the Panthers, managed by XP Events, occurred in late September of

2007. (Simmons Dep. 23.)  The season runs from October through the middle of April.

(Simmons Dep. 38.) Pursuant to the contract, XP Events was granted the exclusive right to sell

Panthers' licensed merchandise during the Panthers' games. (Contract, Ex. 1 to Simmons Dep.)

XP Events was paid a significant amount of money[3] upfront and then a percentage of royalties.

(A. Fey Dep. 56; Simmons Dep. 28, 40.)

XP Events supplies all the Panthers'  merchandise and has storage facilities at the arena.

(A. Fey Dep. 27; Simmons Dep. 10-11.)  XP Events has two full-time employees and between

15-40 part time workers who work the kiosks. (A. Fey Dep. 24-25 Simmons Dep. 11.)  XP

Events orders product for the store on a continuing basis. (Simmons Dep. 13.)  The merchandise

is ordered out of state and shipped to Florida and the bills are paid out of the Denver office. (A.

Fey Dep. 53-54.)  XP Events works with Ms. Simmons on a weekly basis regarding ordering

merchandise, the day-to-day operation of the stores, customer service and promotion. (Simmons

Dep. 14-15, 30.)  XP Events takes care of art and design work and has given input on the

Panthers' new point of sale software system. (Simmons Dep. 24, 32.)  Two buyers from XP

Events' Phoenix office visited Florida on business three or four times. (Simmons Dep. 34-35.)

XP Events is in control of the store space and storage area the entire year. (Simmons Dep.

20-21.)  XP Events does not manage the stores when the Panthers are not playing. (Simmons

---

[3] The precise amount is under seal and can be found on page 56 of Alan Fey's deposition.

Dep. 5.) When payment is made to the Panthers by XP Events, it is done by check which is given to the Panthers in Florida. (Simmons Dep. 22.)   Pursuant the contract, XP Events is required to purchase a certain number of tickets to the arena. (Simmons Dep. 31.)  The volume of sales sold by XP Events in 2007 was substantial.[4] (Simmons Dep. 39.)

The contract is governed by Florida law and must be litigated in Florida. (A. Fey Dep. 41-42.)  XP Events was required to maintain insurance that identified the Panthers as additional insureds. (Section 3.10, Contract, Ex. 32 to Wall Dep.)   XP Events has a bank account in Florida and a cash room at the arena. (A. Fey Dep. 32; Simmons Dep. 40.)  XP Events is responsible for paying the Florida sales tax. (Simmons Dep. 41.)

XP Events is not currently soliciting any business contacts in Florida. (A. Fey Dep. 71.) XP Events does not own any real estate in Florida. (A. Fey Dep. 32-33.)  XP Events has no other written contracts with any other Florida business besides the Jaguars and the Panthers. (A. Fey Dep. 33.)   XP Events has bank accounts with national banks that have branches in Florida.  Its accounts were set up in Colorado and XP Events uses those banks in its contracts with the Panthers. (A. Fey Dep. 102-03.)

According to William Wall, who acts as the manager of XP Apparel, XP Apparel does not systematically transact business in Florida. Its only offices are located in Colorado.  XP Apparel is a licensing company, specializing in sports merchandising, including the manufacturing of apparel and sports-related memorabilia.  It maintains no bank accounts in Florida, has no employees in Florida and has no warehouses, offices, retail locations or leases of

---

[4] The exact figure is under seal and can be found on page 39 of Jennifer Simmons' deposition.

interest in real property in Florida. Its only contacts involve internet retail sales and telephone

sales made by consumers to purchase its products.  All sales are made through its Colorado

office.  XP Apparel has not conducted or attended any exhibitions or trade shows in Florida nor

has any representative traveled to Florida for business. (Wall Aff. ¶ ¶ 2-10, DE 116.)

XP Events buys some of  XP Apparel's t-shirts and hats to sell at the BankAtlantic Center

and in Jacksonville, Florida. (A. Fey Dep. 36.) With respect to the Jacksonville Jaguars, the

amount of XP Apparel merchandise is "minimal" and with respect to the Panthers, the amount of

XP Apparel merchandise is about ten percent of what XP Events sells in Florida. (A. Fey Dep.

75-77.)

On April 18, 2008, Mr. Walter Haigh purchased a visor cap at Walt Disney World in

Lake Buena Vista, Florida with a tag that states "officially licensed by XP Apparel" and

"www.XPApparel.com-100% Cotton-Made in Vietnam." (Haigh Aff. ¶ 2, attached to DE 120.)

## II.  Legal Standard

The plaintiff's burden in alleging personal jurisdiction requires that the plaintiff establish

a prima facie case of personal jurisdiction over a nonresident defendant.  A prima facie case is

established if the plaintiff presents enough evidence to withstand a motion for directed verdict.

The district court must accept the facts alleged in the complaint as true, to the extent they are

uncontroverted by the defendant's affidavits.  If by defendant's affidavits or other competent

evidence, defendant sustains the burden of challenging plaintiff's allegations, the plaintiff must

substantiate the jurisdictional allegations in the complaint by affidavits, testimony or documents.

However, where the evidence conflicts, the district court must construe all reasonable inferences

in favor of the plaintiff.  See Future Tech. Today, Inc., v. OSF Healthcare Sys., 218 F.3d 1247,

1249 (11th Cir. 2000); Robinson, 74 F.3d 253, 255 (11th Cir. 1996) citing Madara v. Hall, 916 F.2d 1510, 1514 (11th Cir. 1990).

III. Discussion

A. Personal Jurisdiction over Defendant XP Companies

Plaintiffs assert specific jurisdiction over XP Companies and point to Jeremy Fey's communications with Plaintiff by way of telephone calls, emails and facsimiles

The determination of personal jurisdiction over a nonresident defendant requires a two-part analysis. When jurisdiction is based on diversity, Rule 4(e) of the Federal Rules of Civil Procedure requires that the assertion of jurisdiction be determined by the state long-arm statute. If there is a basis for the assertion of personal jurisdiction under the state statute, the Court must next determine whether: (1) sufficient minimum contacts exist to satisfy the Due Process Clause of the Fourteenth Amendment and that (2) maintenance of the suit does not offend "traditional notions of fair play and substantial justice." International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945); Venetian Salami Co. v. Parthenais, 554 So.2d 499, 502 (Fla. 1989). Only if both prongs of the Due Process analysis are satisfied may this Court exercise personal jurisdiction over a nonresident defendant. Robinson v. Giarmarco & Bill, P.C., 74 F.3d 253, 256 (11th Cir. 1996) citing Madara, 916 F.2d at 1514; International Shoe Co. v. Washington, 326 U.S. at 316.

Minimum contacts in the context of specific jurisdiction involve three criteria: First, the contacts must be related to the plaintiff's cause of action or have given rise to it. Second, the contacts must involve some purposeful availment of the privilege of conducting activities within the forum, thereby invoking the benefits and protections of its laws. Finally, the defendant's contacts within the forum state must be such that it should reasonably anticipate being haled into

11

court there.  See Sculptchair, Inc. v. Century Arts, Ltd., 94 F.3d 623, 631 (11th Cir. 1996).

Notably, XP Companies concedes that the requirements of Florida long-arm statute, Florida

Statutes § 48.193(1), are met.  Thus, the Court need only conduct an analysis regarding minimum

contacts and fair play.

　　　The Eleventh Circuit has stated that a contract with an out-of-state party cannot, standing

alone, automatically establish sufficient minimum contacts.  Francosteel Corp. v. M/V Charm, 19

F.3d 624, 627 (11th Cir. 1994).  In so holding, the Court noted that a contract is "ordinarily but an

intermediate step serving to tie up prior business negotiations with future consequences which

themselves are the real object of the business transaction." The inquiry must instead focus on

"prior negotiations," "contemplated future consequences," "the terms of the contract and the

parties' actual course of dealing." Id. at 627-28 citing Burger King Corp. v. Rudzewicz, 471 U.S.

462, 478-79 (1985).  Here, Plaintiffs rely on the communications and negotiations by this

Defendant via telephone, email and facsimile to Florida to establish the necessary minimum

contacts. Defendant does not present any evidence to refute Plaintiffs' contention that these

numerous communications, including 188 telephone calls made by Jeremy Fey to Plaintiffs,

occurred. Instead, Defendant argues that there is no evidence showing that telephone calls and

emails are sufficient to establish contacts.

　　　In support, Defendant cites Hartcourt Co., Inc. v. Hogue, 817 So. 2d 1067 (Fla. Dist. Ct.

App. 2002) and Sun Bank, N.A., v. E.F. Hutton & Co., Inc., 926 So. 2d 1030 (11th Cir. 1991).

Both of these cases are factually inapposite.  The plaintiff in Sun Bank relied on a mere two

telephone calls upon which to base its argument for jurisdiction.  Here, there are 188 telephone

calls.  In Harcourt, the Court stated that "although it took a few telephone calls and email

12

transmissions to make the arrangements, the agreement was an isolated transaction." <u>Id.</u> at 1072. This agreement was intended to run for approximately five years.  Moreover, the Court does not read <u>Harcourt</u> as holding that telephone calls and emails are categorically insufficient to establish minimum contacts.

Defendant also points to <u>Borg-Warner Acceptance Corp. v. Lovett & Tharpe, Inc.</u>, 786 F.2d 1055 (11th Cir. 1986) and notes that it "quoted with approval" <u>Scullin Steel v. National Railway Utilization Corp.</u>, 676 F.2d 309 (8th Cir. 1982).  In <u>Scullin</u>, the court stated that the use of the telephone and mail are ancillary factors that cannot alone provide minimum contacts. <u>Borg-Warner</u> did not directly address this issue. Instead, it stated in a footnote that some of these ancillary factors "may not" have been present in <u>Borg-Warner</u> and that the absence of these factors supported a finding that there were no minimum contacts.  <u>Borg-Warner</u>, 786 F.2d at 1062 n.4.  Moreover, <u>Borg-Warner</u> did not address whether numerous telephone calls and other communications could establish jurisdiction over a defendant.[5]

Of course, in examining the telephone calls and emails, the Court must look to whether Defendant "purposefully directed" its actions towards Florida.  <u>Burger King</u>, 471 U.S. at 476. The United States Supreme Court has stated that "it is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines," and that personal jurisdiction cannot be defeated merely because a defendant did not "physically enter" the forum state. <u>Id.</u>; <u>see</u> <u>Cable/Home Comm. Corp. v. Network Prods., Inc.</u>, 902 F.2d 829, 858 (11th Cir. 1990) ("[i]n our technologically sophisticated world permitting

---

[5] <u>Borg-Wilson</u> also looked at personal jurisdiction cases involving non-resident purchasers for one-time transactions.  <u>Future Tech.</u>, 218 F.3d at 1251-52.  Here, the contract envisioned a long-term relationship between the parties.

interstate business transactions by mail, wire and satellite signals, physical presence by the nonresident defendant is not necessary for personal jurisdiction in the forum state")  Of course, purposeful direction would require that the telephone communications be substantial, and not a single telephone call. See Future Tech., 218 F.3d at 1251 (finding no personal jurisdiction based on one telephone call and no visits to the forum state); see also Air Prods and Controls, Inc. v. Safetech Intern., Inc., 503 F.3d 544, 551-52 (6th Cir. 2007) (numerous telephone calls, emails and facsimiles initiated by the non-resident defendant can demonstrate purposeful availment); Rambo v. American Southern Ins. Co., 839 F.2d 1415, 1418 (10th Cir. 1988) (telephone calls and letters may provide sufficient contacts to meet due process standards); Mayville v. Glatkowski, No. 1:08-CV-232-TWT, 2008 WL 2037155, at * 5 (N.D. Ga. 2008) (telephone, email and written correspondence adequate to establish personal jurisdiction); Achievers Unlimited, Inc. v. Nutri Herb, Inc., 710 So.2d 716 (Fla. Dist. Ct. App. 1998) (additional contacts with Florida established by communicating with plaintiff in Florida by telephone, telefax, and mail).  Given the number of contacts initiated by Defendant, the Court finds that minimum contacts are established.[6]

---

[6]  With respect to Mr. Wall, the Court finds that there is no long-arm jurisdiction over him related to the contract entered into with Plaintiffs. None of Mr. Wall's acts are alleged to have been taken outside his corporate duties.  See Doe v. Thompson, 620 So. 2d 1004, 1006 (Fla. 1993) ("acts of corporate employee performed in corporate capacity do not form the basis for jurisdiction over corporate employee in individual capacity"); cf. Ryan v. Wren, 413 So. 2d 1223, 1224 (Fla. Dist. Ct. App. 1982) (an officer of a corporation cannot be held liable on a contract "in his individual capacity unless he either signed the contract in his individual capacity or unless the corporate veil was pierced or the corporate entity should be ignored because it was found to be formed or used for fraudulent purposes or where the corporation was merely the alter ego of the shareholder.").  As such, personal jurisdiction cannot be exercised over Mr. Wall for counts one through five of the SAC based on his actions taken on behalf of XP Companies.  If these contract-related claims were the only claims against Mr. Wall, there would be no personal jurisdiction against him.  However, to the extent that personal jurisdiction could be exercised over him with respect to the tort claims, the Court would have pendent personal jurisdiction over the contract-related claims.  See Section III(C), infra, at 19-24 and n.15.

Next, the Court concludes that finding XP Companies amenable to personal jurisdiction in Florida comports with "traditional notions of fair pay and substantial justice." In this Circuit, the factors to decide whether the assertion of personal jurisdiction comports with "traditional notions of fair play and substantial justice" are: 1) the burden on the defendant in defending the lawsuit; 2) the forum state's interest in adjudicating the dispute; 3) the plaintiff's interest in obtaining convenient and effective relief; 4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies and 5) the shared interest of the states in furthering fundamental substantive social policies. Cronin v. Washington Nat. Ins. Co., 980 F.2d 663, 671 (11th Cir. 1993) citing Asahi Metal Industry Co. v. Superior Court of California, 480 U.S. 102, 113 (1987); Madara, 916 F.2d at 1517.

The Court finds that Florida has an interest in adjudicating a dispute that revolves around an out-of-state corporation engaged in a breach of contract for an exhibition in Florida. Furthermore, Plaintiffs have sued numerous Defendants, over whom the Court can also assert personal jurisdiction, and it is in the interstate judicial system's interest to litigate this case in one forum.  Plaintiffs will also obtain the most convenient and effective relief by litigating this case in Florida.   Lastly, "modern transportation and communication have made it much less burdensome" for an out-of-state Defendant to be sued in another state.  Cable/Home, 902 F.2d at 858 (citations omitted).  As such, personal jurisdiction can be exercised over XP Companies.

B.  Personal Jurisdiction over Defendant XP Entertainment

In order for a court to exercise general jurisdiction in Florida, the contacts must be especially pervasive and substantial to satisfy section two of the Florida long-arm statute 48.193. General Cigar Holdings, Inc. v. Altadis S.A., 205 F. Supp. 2d 1335, 1343 (S.D. Fla. 2002); see

15

Florida Statutes.§ 48.193(2).   The general jurisdiction provision of the statute states:

> A defendant who is engaged in substantial and not isolated activity within this state, whether such activity is wholly interstate, intrastate, or otherwise, is subject to the jurisdiction of the courts of this state, whether or not the claim arises from that activity.

Id.  General jurisdiction arises from a defendant's contacts with Florida that are not directly related to the cause of action being litigated and connexity between a defendant's activities and the cause of action is not required.  Consolidated Dev. Corp. v. Sherritt, Inc., 216 F.3d 1286, 1292 (11th Cir. 2000). The "substantial and not isolated activity" requirement of the long-arm statute has been recognized by Florida courts as the functional equivalent of the continuous and systematic contact requirement for general jurisdiction under the Fourteenth Amendment Due Process Clause as discussed in Helicopteros Nacionales de Colombia S.A. v. Hall, 466 U.S. 408, 413-416 (1984); see Woods v. Nova Cos. Belize, Ltd., 739 So.2d 617, 620 (Fla. Dist. Ct. App. 1999); Achievers Unlimited, Inc. v. Nutri Herb, Inc., 710 So.2d 716, 720 (Fla. Dist. Ct. App. 1998).  A finding that a defendant's activities satisfy section 48.193(2)'s requirements also necessitates a finding that minimum contacts exist.  See Universal Carribean Estab. v. Bard, 543 So.2d 447, 448 (Fla. Dist. Ct. App. 1989).  Therefore, the analysis of jurisdiction under section 48.193(2) and the Due Process clause merge.

As there is no requirement of a connection between the defendant's activities and the cause of action, the Due Process requirements are much more stringent for general personal jurisdiction than for specific personal jurisdiction.  Due Process requires a showing of substantial, persistent, continuous, and systematic business contacts between the defendant and the forum state.  Helicopteros, 446 U.S. at 414 nn.8, 9; Ruiz de Molina v. Merritt & Furman Ins.

16

Agency, Inc., 207 F.3d 1351, 1357 n.4 (11th Cir. 2000);  Meier v. Sun International Hotels, Ltd.,

288 F.3d 1264, 1274 (11th Cir. 2002); Borg-Warner, 786 F.2d at 1057.  "The substantial

connection between a defendant and the forum state must come about by an action of the

defendant purposefully directed toward the forum state."  Nida Corp. v. Nida, 118 F. Supp. 2d

1223, 1229 (M.D. Fla. 2000) citing Asahi Metal Indus. Co. v. Superior Ct. of Cal., Solano Cty.,

480 U.S. 102, 108-09 (1987).  The defendant's contacts "must be so extensive to be tantamount

to [a defendant] being constructively present in the state to such a degree that it would be

fundamentally fair to require it to answer in [the forum state's courts] in any litigation arising out

of any transaction or occurrence taking place anywhere in the world."  Baker v. Carnival Corp.,

No. 06-21527-CIV-HUCK, 2006 WL 3360418, at * 2 (S.D. Fla. Nov. 20, 2006) citing Purdue

Research Foundation v. Sanofi Synthelabo, S.A., 338 F.3d 773, 787 (7th Cir. 2003)

    The evidence shows that XP Entertainment has two lucrative contracts, one of which

extends over ten years, with two professional sports teams in the state of Florida for the sale of

apparel.  XP Entertainment has permanent employees, offices and storage facilities in Florida to

manage these contractual obligations.  The president of XP Entertainment, Alan Fey, has traveled

to Florida in connection with these contracts and buyers for XP Entertainment have also visited

Florida on business-related duties.  XP Entertainment orders product for the Panthers' store on a

continuing basis and ships merchandise to Florida.  Furthermore, XP Entertainment works on a

weekly basis with the Panthers to effectuate the ordering of the merchandise and the day-to-day

operation of the stores.  Lastly, XP Entertainment has a bank account in Florida and a cash room

at the Panthers' arena.  The Court finds that these facts meet the test for general jurisdiction. See

KVAR Energy Savings, Inc. v. Tri-State Energy Solutions, LLP, No. 6:08-cv-85-Orl-19KRS,

2009 WL 103645, at * 6 (M.D. Fla. Jan. 15, 2009) (finding general jurisdiction when the

defendant initiated contact with the plaintiff in Florida, distributed the plaintiff's products,

regularly made contact with the defendant's representatives in Florida and demonstrated an intent

to maintain a long-term relationship with the plaintiff); Autonation, Inc. v. Hankins, No. 03-

14544, 2003 WL 22852206, at *5 (Nov. 24, 2003) (general jurisdiction found when the

defendant received frequent supervision and direction from his Florida employer and obtained

confidential business information from his employer); Achievers Unlimited, Inc. v. Nutri Herb,

Inc., 710 So. 2d 716, 720 (Fla. Dist. Ct. App. 1998) (three-year distribution relationship with a

Florida corporation establishes general jurisdiction).

   While XP Entertainment attempts to minimize these contacts, the focus of its attack on

the assertion of personal jurisdiction is primarily a legal one. Namely, XP Entertainment argues

that its contacts with the Panthers and Jaguars did not commence until after the filing of the

Complaint in this action and therefore must not be considered.  In support, Defendant points to

Carib-USA Ship Lines Bahamas Ltd. v. Dorsett, 935 So. 2d 1272 (Fla. Dist. Ct. App. 2006).

Carib-USA stated that "[c]ontacts are generally assessed over a period of years prior to the filing

of the complaint" and that contacts established after the time of the service of the complaint

should not be used to establish minimum contacts. Id. at 1276. Carib-USA relied upon Woods v.

Nova Companies Belize Ltd., 739 So. 2d 617 (Fla. Dist. Ct. App.  1999), which cited to

Metropolitan Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560, 569 (2d Cir.1996). However,

Metropolitian Life addressed whether contacts should be assessed based on the time period of

one year prior to the lawsuit being filed or based on several years prior to the lawsuit being filed.

There was no discussion about disregarding a defendant's contacts that commenced in the forum

state after the lawsuit was filed.  Nor should there have been. Once a defendant has continuous

and systemic contacts with a forum state, its activities are no longer haphazard or fortuitous.[7]  For

these reasons, the Court rejects Defendant's argument.  Finally, with respect to fair play, the

Court adopts the reasoning applied supra to XP Companies.

C.  Personal Jurisdiction over XP Apparel and Mr. Wall

Plaintiffs contend that jurisdiction can be asserted over XP Apparel and Mr. Wall

pursuant to both specific and general jurisdiction. With respect to specific jurisdiction, Plaintiffs

claim that Jeremy Fey, XP Apparel's agent, sought out Plaintiffs for a business relationship that

resulted in "the misrepresentations and promises" that are the subject of the claims for fraud in

the inducement, negligent misrepresentation and promissory estoppel against XP Apparel.  With

respect to general jurisdiction, Plaintiffs point to XP Apparel's substantial activities in Florida as

grounds for asserting jurisdiction.

It appears that Plaintiff is claiming specific jurisdiction under Fla. Stat. 48.193(1)(b)

which provides:

(1)     Any person, whether or not a citizen or resident of this state, who personally or
through an agent does any of the acts enumerated in this subsection thereby
submits himself, and if he is a natural person, his personal representative to the
jurisdiction of the courts of this state for any cause of action arising from doing of
any of the following acts:

(b)     Committing a tortious act within this state.

Fraud in the inducement and negligent misrepresentation are torts that can establish

---

[7] Under Defendant's approach to personal jurisdiction, a Florida resident could escape
personal jurisdiction in Florida because he did not live in Florida at the time of the act in
question.  Of course, such an argument would fail.  See Haueter-Herranz v. Romero, 975 So. 2d
511, 516 (Fla. Dist. Ct. App. 2008) (residents of Florida are subject to jurisdiction by Florida
courts).

personal jurisdiction.[8] OSI Industries, Inc. v. Carter, 834 So. 2d 362, 367 (Fla. Dist. Ct. App. 2003) (discussing both intentional and negligent misrepresentation as torts under the long-arm statute). In Wendt v. Horowitz, the Florida Supreme Court found long-arm jurisdiction where an out-of-state defendant allegedly made "telephonic, electronic, or written communications into Florida" and the cause of action arose from those communications. Wendt v. Horowitz, 822 So.2d 1252, 1260 (2002); see Acquadro v. Bergeron, 851 So. 2d 665 (Fla. 2003) (allegations sufficient to support jurisdiction where nonresident allegedly committed defamation in a single telephone call into Florida); Machtinger v. Inertial Airline Services, Inc., 937 So.2d 730, 735 (Fla. Dist. Ct. App. 2006) (fraudulent misrepresentations made from outside Florida and directed into Florida by phone, fax, and writings constitute tortious acts committed within Florida under Florida's long-arm statute). Moreover, the Wendt Court held that a defendant's physical presence is not required in order to "commit a tortious act in Florida."[9] Id. Given that it is uncontested that XP Apparel made telephone calls and email communications into Florida in furtherance of a business relationship with Plaintiffs, long-arm jurisdiction would be established, assuming that

---

[8] XP Apparel states that Plaintiffs' claims for negligent misrepresentation, a non-intentional tort, and promissory estoppel, a non-tort claim, cannot establish personal jurisdiction. The long-arm statute provides for long-arm jurisdiction over a tort and does not distinguish between intentional and negligent torts. See OSI Industries, 834 So. 2d at 367 (discussing both intentional and negligent misrepresentation as torts under the long-arm statute). However, to the extent Plaintiffs are asserting personal jurisdiction for promissory estoppel under this provision of the long-arm statute, it would fail.

[9] Notably, Posner v. Essex Ins. Co., Ltd., which was decided prior to Wendt, went even further and interpreted Florida Statutes § 48.193(1)(b) to mean that a defendant who commits a tort that causes injury in Florida is subject to personal jurisdiction even if the act that caused the injury occurred entirely out of state. See Posner v. Essex Ins. Co., Ltd., 178 F.3d 1209, 1216-17 (11th Cir. 1999). In other words, a tortious act committed outside of the state of Florida resulting in injury to a Florida resident confers personal jurisdiction under Florida Statutes § 48.193(1)(b).

Plaintiffs could demonstrate that the tort occurred.[10]  After all, "[w]here the jurisdictional issues are intertwined with the substantive merits, 'the jurisdictional issues should be referred to the merits, for it is impossible to decide one without the other.'" Eaton v. Dorchester Dev., Inc., 692 F.2d 727, 733 (11th Cir. 1982) quoting Chatham Condo. Assocs. v. Century Village, Inc., 597 F.2d 1002, 1011 (5th Cir. 1979).  In reaching that conclusion, the Court in Eaton relied on binding Fifth Circuit precedent[11] that held that when substantive and jurisdictional issues are intertwined, a finding on jurisdiction should not be rendered until a decision on the merits could be resolved.[12] See id. (citations omitted).  Based on this directive from the Eleventh Circuit, the Court will exercise its discretion to reserve ruling on the jurisdictional issues until a decision on the merits can be rendered.[13]  See Nissim Corp. v. Clearplay, Inc., 351 F. Supp. 2d 1343, 1351-52 (S.D. Fla. 2004).

_____

[10] Defendant's reliance on McLean Financial Corp. v. Winslow Loudermilk Corp. for the holding that alleged misrepresentations made in telephone conversations between plaintiffs in Florida and defendants in Virginia did not provide a basis for exercising personal jurisdiction is unpersuasive.  McLean , 509 So.2d 1373, 1374 (Fla. Dist. Ct. App. 1987). After Wendt, McLean is no longer good law.  Wendt, 822 So. 2d at 1260.  Furthermore, Defendant's reliance on Sculptchair is misplaced.  Sculputchair did not address the commission of a tort. Sculptchair, 94 F.3d at 627-30.

[11] In Bonner v. City of Pritchard, 661 F.2d 1206, 1207 & 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent the decisions of the Fifth Circuit rendered prior to October 1, 1981.

[12] Although Eaton and the binding Fifth Circuit cases it relies upon address subject matter jurisdiction, the Court concludes that the reasoning of these cases apply with equal force to personal jurisdiction.

[13] The Court notes that XP Apparel may renew its arguments in a summary judgment motion.  Of course, if material issues of fact exist on the merits of the claim, then the issue will need to be presented at trial.  See Nissim, 351 F. Supp. 2d at 1352; Lawrence v. Dunbar, 919 F.2d 1525, 1530-31 (11th Cir. 1990).

The Court next turns to minimum contacts.  When an intentional tort is alleged, personal jurisdiction may be supported over a non-resident defendant who has no other contacts with the forum.  Calder v. Jones, 465 U.S. 783, 790 (1984). In Calder, a California entertainer and resident brought suit, claiming she was a victim of libel by an article published in the National Enquirer, a publication with a large California circulation.  Id. at 784. The Calder defendants were residents of Florida.  Id. at 785-86.  One of the defendants, a reporter, did most of his research in Florida and made several telephone calls to California for information.  Id. at 785. The other defendant had no contacts with Florida, and simply reviewed the reporter's article.  Id. at 786.  In finding that personal jurisdiction over the Florida defendants was properly asserted in the California court, the Supreme Court noted that the defendants knew that the article would harm the plaintiff and that the injury would be sustained by the plaintiff in California, the state where she lived and worked and where the publication had its largest circulation.  Id. at 789-90. Accordingly, the United States Supreme Court held that personal jurisdiction can be based on an intentional act that was "expressly aimed" at the forum state and which the defendant knew would cause harm in the forum state.  Id.  In other words, personal jurisdiction over defendants may be based on the "effects" of their conduct. Id. at 789.  In Keeton v. Hustler Magazine, Inc., decided the same day as Calder, the Supreme Court explained that "states have a special interest in exercising personal jurisdiction over those who commit torts within its territory." Keeton,  465 U.S. 770, 776 (1984) quoting Leeper v. Leeper, 319 A.2d 626 (1974).

Here, there is uncontested evidence that numerous telephone calls and emails were sent by XP Apparel to Plaintiffs.  See Neal v. Janssen, 270 F.3d 328, 332 (6th Cir. 2001) ("[M]aking phone calls and sending facsimiles into the forum, standing alone, may be sufficient to confer

22

jurisdiction on the foreign defendant where the phone calls and faxes form the bases for the action."); Oriental Trading Co., Inc. v. Firetti, 236 F.3d 938, 943 (8th Cir. 2001) (in the intentional tort context, minimum contacts exists when non-resident defendant made only phone calls and faxes and did not enter state). These contacts far exceed the nature of the contacts that established minimum contacts in Calder. Thus, assuming that Plaintiff can prove that XP Apparel and Wall induced Exhibit Icons to enter into the contract, and sought to shift liability to XP Companies, LLC in order to shield XP Apparel from liability under the contract, due process would be satisfied under the Calder test. See New Lenox Industries v. Fenton, 510 F. Supp. 2d 893, 904 (M.D. Fla. 2007) ("where a defendant's tortuous conduct is intentionally and purposefully directed at a resident of the forum, the minimum contacts requirement is met, and the defendant should anticipate being haled into court in that forum.")[14] The Court adopts the reasoning applied to XP Companies regarding fair play.

With respect to personal jurisdiction over Mr. Wall for these tort claims, the Court notes that individual officers are personally liable for torts they commit, even if those torts arise from acts performed within the scope of their employment. See Florida Speciality, Inc. v. H 2 Ology, Inc., 742 So. 2d 523, 527-28 (Fla. Dist. Ct. App. 1999). Therefore, assuming that Plaintiff succeeds on the merits, minimum contacts are established over Mr. Wall.[15] As such, it is

_____

[14] Given that Plaintiff has established specific jurisdiction over XP Apparel, it is unnecessary to reach the question of general jurisdiction. Nonetheless, the Court observes that the evidence provided by Plaintiff about the sale of XP Apparel merchandise purchased by Florida vendors constitutes de minimis and fortuitous contacts which are insufficient to establish general jurisdiction over XP Apparel. See TRW Vehicle Safety Systems, Inc. v. Santiso, 980 So. 2d 1149 (Fla. Dist. Ct. App. 2008).

[15] The tort claims and the contract-related claims arise out of a common nucleus of operative facts. Thus, the doctrine of "pendent personal jurisdiction" comes into play. Under

necessary to examine whether assertion of personal jurisdiction over Mr. Wall comports with fair play. Litigating this action against Mr. Wall will not be a burden to him. Given Mr. Wall's role with the corporate Defendants, Mr. Wall will have a significant role in their defense.  He will undoubtedly be a witness at trial and thus will not be unduly burdened by answering the claims against him in Florida.  For these reasons, the Court finds that the requirements of reasonableness and fairness of asserting jurisdiction over Mr. Wall have been met.[16]

   *MOTION TO STRIKE*

   In response to Plaintiffs' Second Amended Complaint, Defendants filed a Second Amended Answer, asserting numerous affirmative defenses.  Plaintiffs have moved to strike several of Defendants' affirmative defenses and portions of their answer.

   Pursuant to Rule 12(f) of the Federal Rules of Civil Procedure, a party may move to strike "any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter" within the pleadings. Fed.R.Civ.P. 12(f). Motions to strike, however, are generally disfavored by the

---

this doctrine, as long as personal jurisdiction can be asserted over Mr. Wall for the tort claims, there would be also be personal jurisdiction over the contract-related claims.  See Cincinnati Ins. Co. v. Belkin Corp., No. 07-0615-WS-C, 2008 WL 4949783, at * 16 (S.D. Ala. Nov. 14, 2008) citing Action Embroidery Corp. v. Atlantic Embroidery, Inc., 368 F.3d 1174 (9th Cir. 2004); United States v. Botefuhr, 309 F.3d 1263, 1272-75 (10th Cir.2002); Robinson Eng'g Co., Ltd. Pension Plant Trust v. George, 223 F.3d 445, 449-50 (7th Cir.2000); ESAB Group, Inc. v. Centricut, Inc., 126 F.3d 617, 628-29 (4th Cir.1997); IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1056-57 (2d Cir.1993); Oetiker v. Werke, 556 F.2d 1, 5 (D.C.Cir.1977); Robinson v. Penn Cent. Co., 484 F.2d 553, 555-56 (3d Cir.1973).

[16] The Court notes that Defendants made the alternative argument that venue is improper. The causes of action for contract and tort arose in the Southern District of Florida.  Therefore, venue is proper in this district.  28 U.S.C. § 1391.  Furthermore, Defendants have not set forth sufficient grounds to establish that a change of venue is appropriate pursuant to 28 U.S.C. § 1404, especially given that there is a presumption in favor of a plaintiff's choice of forum. See Tampa Bay Storm, Inc. v. Arena Football League, Inc., 932 F. Supp. 281, 282 (M.D. Fla. 1996).

court. See Williams v. Jader Fuel Co., 944 F.2d 1388, 1400 (7th Cir.1991). The reason is that

courts consider striking a pleading to be a "drastic remedy to be resorted to only when required

for the purposes of justice." Augustus v. Bd. of Pub. Instruction of Escambia County, Fla., 306

F.2d 862, 868 (5th Cir.1962)  quoting Brown & Williamson Tobacco Corp. v. United States, 201

F.2d 819, 822 (6th Cir.1953). That stated, an affirmative defense may be stricken if the defense is

"insufficient as a matter of law." Microsoft Corp. v. Jesse's Computers & Repair, Inc., 211

F.R.D. 681, 683 (M.D. Fla.2002) citing Anchor Hocking Corp. v. Jacksonville Elec. Auth., 419

F. Supp. 992, 1000 (M.D. Fla.1976). A defense is insufficient as a matter of law only if: (1) on

the face of the pleadings, it is patently frivolous, or (2) it is clearly invalid as a matter of law. Id.

Plaintiffs move to strike several affirmative defenses on the basis that they have not been

pled with adequate specificity to give fair notice of the defenses asserted.  The Court agrees that

the defenses alleged in paragraph 99, 118 and 119 fail to provide adequate specificity.  That

failure, however, does not render these Affirmative Defenses insufficient as a matter of law and

subject to a motion to strike. Instead, the lack of specificity is best dealt with by a motion for a

more definite statement under Rule 12(e) of the Federal Rules of Civil Procedure. That Rule

requires a more definite statement when a pleading is "vague" or "ambiguous." Fed.R.Civ.P.

12(e).  Therefore, the Court will allow Defendants the opportunity to amend these affirmative

defenses to provide the necessary specificity.

Next, the Court notes that several of the affirmative defenses are not affirmative defenses,

but a denial of an allegation lodged against Plaintiffs by Defendants.  As such, paragraphs 113,

114 and 117 must be stricken.  See In re Rawson Food Service, Inc., 846 F.2d 1343, 1349 (11th

Cir.1988) ("[a] defense which points out a defect in the plaintiff's prima facie case is not an

affirmative defense.")

Paragraph 110 states that "The purpose of any alleged agreement has been commercially frustrated because of the impossibility or impracticability of performance, preventing plaintiffs' claims for breach of contract." Plaintiffs state that this defense is improper because commercial impracticability only applies to contracts involving the sale of goods. Defendants respond that the "impracticability defense" does not just apply to the sale of goods. The Court finds that this affirmative defense suffers from several pleading deficiences. First, it is unclear if Defendants are claiming common law "impracticability of performance" as a subset of impossibility of performance, see Valencia Ctr., Inc. v. Publix Super Markets, Inc., 464 So. 2d 1267, 1269, or commercial impracticability as envisioned under the Uniform Commercial Code, see Eastern Air Lines, Inc. v. Gulf Oil Corp., 415 F. Supp. 429, 438 (S.D. Fla. 1975). Furthermore, both the impossibility or impracticability defenses fail to provide fair notice of the defenses alleged. Thus, paragraph 110 must be re-pled.

Paragraph 115 states that "Any alleged agreement is void as a result of unilateral mistake." Both parties point to Orkin Exterminating Co. v. Palm Beach Hotel Condominium Assoc., 454 So. 2d 697 (Fla. Dist. Ct. App. 1984). That case states that a mistake by one party may make a contract *voidable*. Id. at 698 (emphasis added). Defendants may amend this affirmative defense to comply with Orkin. Defendants should also provide fair notice of the facts supporting this affirmative defense.

Lastly, regarding paragraphs 24 and 32, Plaintiffs note that Defendants have agreed to amend these paragraphs to identify which Defendants are admitting or denying the allegations. Thus, Defendants amended answer shall include this amendment. The Court has examined

paragraphs 33 through 37 and finds nothing improper about Defendants' response.

<u>CONCLUSION</u>

It is hereby **ORDERED AND ADJUDGED** as follows:

1)      Defendants XP Companies, XP Entertainment and Wall's Motion to Dismiss the Amended Complaint or, in the Alternative, Transfer of Venue (DE 19) is **DENIED**.

2)      Plaintiffs' Motion for Leave to File a Brief Surreply to Defendants' Reply Memorandum (DE 88) is **DENIED**.

3)      Plaintiffs' Request for Oral Argument on Defendants' Motion to Dismiss for Lack of Jurisdiction (DE 92) is **DENIED**.

4)      Defendants XP Companies, XP Entertainment and Wall's Motion to Dismiss Second Amended Complaint for Lack of Personal Jurisdiction, or, in the Alternative, Change of Venue (DE 99) is **DENIED**.

5)      Plaintiffs' Request for Oral Argument on Defendants' XP Companies, LLC, XP Entertainment, LLC and William Wall III's Motion to Dismiss Verified Second Amended Complaint (DE 112) is **DENIED**.

6)      Defendant XP Apparel's Motion, and Joinder in the Defendants' Motion, to Dismiss Second Amended Complaint for Lack of Personal Jurisdiction or, in the Alternative, Change of Venue (DE 115) is **DENIED WITHOUT PREJUDICE**.

7)      Plaintiffs' Request for a Hearing on Defendant XP Apparel, LLC's Motion to Dismiss for Lack of Jurisdiction (DE 119) is **DENIED**.

8)      Plaintiffs' Motion to Strike Affirmative Defenses and Portions of Defendants'

Answer (DE 126) is **DENIED AS MOOT**.

9)      Plaintiffs' Motion to Strike Affirmative Defenses and Portions of Defendants'

Answer (DE 132) is **GRANTED IN PART AND DENIED IN PART**.

**DONE AND ORDERED** in Chambers at West Palm Beach, Florida, this 26th day of

March, 2009.

KENNETH A. MARRA
United States District Judge

28